RECORD NO. 14-1316

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

MIDATLANTIC INTERNATIONAL INC.,

*Plaintiff-Appellee,*

v.

AGC FLAT GLASS NORTH AMERICA, INC,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

## OPENING BRIEF OF APPELLANT

Joseph M. Rainsbury
LeClairRyan, a Professional Corporation
1800 Wells Fargo Tower, Suite 1200
Roanoke, Virginia 24006
(540) 510-3055 Telephone
(540) 510-3050 Facsimile
joseph.rainsbury@leclairryan.com

Charles M. Sims
LeClairRyan, a Professional Corporation
951 East Byrd Street, 8th Floor
Richmond, Virginia 23219
(804) 343-5091 Telephone
(804) 916-7243 Facsimile
charles.sims@leclairryan.com

*Counsel for Appellant*                                                      July 11, 2014

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1316__       Caption: __MidAtlantic International Inc. v. AGC Flat Glass North America, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__AGC Flat Glass North America, Inc.__
(name of party/amicus)

_____

who is _____Defendant-Appellant_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      AGC America, Inc. (parent)
      Asahi Glass Co., Ltd. (grandparent, a Japanese publicly traded company)

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☑ YES ☐ NO
      If yes, identify all such owners:
      Asahi Glass Co., Ltd. (indirectly, as grandparent company)

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date:    April 22, 2014

Counsel for:  AGC Flat Glass North America, Inc.

## CERTIFICATE OF SERVICE
*****************************

I certify that on     April 22, 20014     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
(signature)

April 22, 2014
(date)

- 2 -

## CONTENTS

TABLE OF AUTHORITIES................................................................iii

JURISDICTIONAL STATEMENT ...........................................1

ISSUES PRESENTED FOR REVIEW.....................................2

STATEMENT OF THE CASE .................................................3

SUMMARY OF ARGUMENT ................................................17

ARGUMENT.............................................................................19

I.  **MidAtlantic's contract claim under the take-or-pay clause failed as a matter of law because the contract expired before AGC ceased buying dolomite from MidAtlantic. ...................19**

    A.  Standard of Review. ......................................................19

    B.  The undisputed evidence shows that AGC complied with the contract through the contract's expiration on December 31, 2011. ...............19

II. **The contract-expiration issue was, at the very least, a jury question. ...............................27**

    A.  Standard of Review ........................................................27

    B.  AGC presented evidence that it met its contract obligations up to, and through, the contract's expiration.......................................27

III. **The District Court's jury instructions rewrote the contract to add a new trigger for the take-or-pay clause. ......................................30**

    A.  The District Court wrongly instructed the jury that asking MidAtlantic to order a shipment of dolomite triggered AGC's obligations under the take-or-pay clause....................30

    B.  AGC's interpretation of the take-or-pay clause makes commercial sense. ...................33

**IV.    The District Court wrongly placed the burden on AGC to show that MidAtlantic's dolomite did not meet specifications.** ............................ 36

**V.    The District Court deprived AGC of a fair trial by disparaging AGC's counsel and by impeding AGC's examination of witnesses** .................... 42

   A.    Standard of Review. ....................................... 42

   B.    A trial judge must preside impartially and must not unduly interfere with the presentation of evidence. ............................... 43

   C.    The District Court exhibited overt bias, impeded AGC's efforts to present its case to the jury, and deprived AGC of a fair trial. ................... 44

      1.    The District Court's constant *sua sponte* interruptions impeded AGC's presentation of its case. ................................................. 44

      2.    The District Court improperly asked leading questions to elicit evidence favorable to MidAtlantic and to discredit MidAtlantic's witnesses. ...................................... 50

      3.    The District Court was openly hostile to AGC's counsel. .................................... 59

      4.    The District Court's boilerplate instruction that the jury was the sole judge of facts did not cure the prejudice created by the District Court's conduct. ............................. 63

**CONCLUSION AND REQUEST FOR ORAL ARGUMENT** ............ 64

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)** ............. 66

**CERTIFICATE OF SERVICE** ................................................ 67

## TABLE OF AUTHORITIES

### Cases

*Alpha Telecommunications, Inc. v. International Business Machines Corp.*, 194 Fed. Appx. 385 (6th Cir. 2006) ............................ 22

*Aratex Servs., Inc. v. Tennessee Commercial Warehouse*, 1993 WL 312675 (Tenn. Ct. App. Aug. 18, 1993) ......................................... 36

*Barnes v. Hamilton County Department of Education,* 2005 WL 240604, No. E2003-02645-COA-R3-CV (Tenn. Ct. App. Feb. 2, 2005) .................................................................................... 21

*Black & Decker (US), Inc. v. Ali Indus., Inc.*, 08-1015, 2008 WL 2951099 (W.D. Tenn. July 24, 2008) ................................ 22, 23, 24

*Bruner v. Office of Pers. Mgmt.*, 996 F.2d 290 (Fed.Cir.1993) ............... 39

*CBX Technologies, Inc. v. GCC Technologies, LLC*, 533 Fed. Appx. 182 (4th Cir. 2013) ...................................................... 22

*Crandell v. United States*, 703 F.2d 74 (4th Cir. 1983) .................... 46, 59

*Flowers Baking Co. of Lynchburg, Inc. v. R-P Packaging, Inc.*, 329 S.E.2d 462 (Va. 1985) ............................................. 37

*Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318 (4th Cir. 2013) .................... 19

*Humphrey v. Humphrey*, 434 F.3d 243 (4th Cir. 2006) ............. 39, 40, 41

*In re Taxman Clothing Co., Inc.*, 905 F.2d 166 (7th Cir.1990) .............. 41

*John H. Moore & Sons v. Adams*, 324 S.W.2d 499 (Tenn. Ct. App. 1959) ................................................................................ 36

*Kafozi v. Windward Cove, LLC*, 184 S.E.3d 693 (Tenn. Ct. App. 2005) ................................................................................ 20

*Litton Fin. Printing Division v. NLRB*, 501 U.S. 190 (1991) ................. 21

*Marcum v. Ayers*, 398 S.W.3d 624 (Tenn. Ct. App. 2012) ........... 20, 21, 32

*MidAtlantic Int'l, Inc. v. AGC Flat Glass North America, Inc.*, No. 12-1745, 497 F. App'x 279 (4th Cir. 2012) ........................... 13

*Miron v. Yonkers Raceway, Inc.*, 400 F.2d 112 (2d Cir. 1968) ............... 38

*NLRB v. Cone Mills Corp.*, 373 F.2d 595 (4th Cir. 1967) ........................ 21

*Noel v. Artson*, 641 F.3d 580 (4th Cir.2011) ............................................ 28

*Pollard v. Fennell*, 400 F.2d 421 (4th Cir. 1968) .................................... 51

*Pullman–Standard v. Swint*, 456 U.S. 273 (1982) .................................. 39

*Sarah Lee Corp. v. Quality Mfg.*, 201 F. Supp. 608 (M.D.N.C. 2002) ...................................................................................................... 22

*Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745 (Fed. Cl. 2013) .................................................................................................. 22

*Sit-Set, A.G. v. Universal Jet Exchange, Inc.*, 747 F.2d 921 (4th Cir. 1984) ....................................................................... 47, 50, 64

*Towe Iron Works, Inc. v. Towe*, 243 S.W.3d 562 (Tenn. Ct. App. 2006) .................................................................................... 21, 32

*United States v. Cassiagnol*, 420 F.2d 868 (4th Cir. 1970) ......... 43, 44, 60

*United States v. Castner*, 50 F.3d 1267 (4th Cir. 1995) ......................... 49

*United States v. Cherry*, 720 F.3d 161 (4th Cir. 2013) ............................ 43

*United States v. Cole*, 491 F.2d 1276 (4th Cir. 1974) ....................... 43, 45

*United States v. Ecklin*, 528 Fed. Appx. 357 (4th Cir. 2013) ................. 51

*United States v. Godwin*, 272 F.3d 659 (4th Cir. 2001) ............. 43, 51, 52

*United States v. Head*, 697 F.2d 1200 (4th Cir. 1982) ............... 43, 44, 47

*United States v. Kivanc*, 714 F.3d 782 (4th Cir. 2013) .................... 27, 28

*United States v. Norris*, 873 F.2d 1519  (D.C. Cir. 1989) ....................... 45

*United States v. Wilson*, 118 F.3d 228 (4th Cir.1997)............................ 42

*Wallace v. United States*, 281 F.2d 656 (4th Cir. 1960) ........................ 43

*Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467
F.3d 641 (7th Cir. 2006 ...................................................................21

## Statutes

28 U.S.C. § 1291................................................................................ 1

28 U.S.C. § 1332(a)(1)........................................................................ 1

Tenn. Code Ann. § 47-2-607(4)........................................................ 37

## Other Authorities

1 McCormick on Evid. § 8 (7th Ed.) ...............................................50, 51

Christopher B. Mueller and Laird C. Kirkpatrick, 3 Fed.
Evid. § 6:105 ................................................................................50

UCC § 2-607(4)................................................................................38

## Rules

Federal Rule of Appellate Procedure 4(a)(4)(B)(i)..................................1

Federal Rule of Evidence 614(b) ........................................................50

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

This Court has subject-matter jurisdiction under 28 U.S.C. § 1291, because this is an appeal from a final order of the District Court.

The District Court entered its original final order on February 20, 2014. (JA 756.) On February 25, 2014, Appellee filed a motion to amend the judgment to include prejudgment interest. On March 12, 2014, Appellant filed its Notice of Appeal. (JA 757.) On April 4, 2014, the District Court granted Appellee's motion to amend. (JA 760-62.) Pursuant to Federal Rule of Appellate Procedure 4(a)(4)(B)(i), Appellant's Notice of Appeal became effective as of that date. The District Court entered its Amended Judgment on April 7, 2014. (JA 763.)

## ISSUES PRESENTED FOR REVIEW

1.  Whether AGC had a duty, under a contractual "take or pay" clause, to buy leftover dolomite from MidAtlantic where:

    (a)  The clause was triggered only if AGC cancelled the contract or stopped buying dolomite from MidAtlantic, and

    (b)  The undisputed evidence showed that: (1) AGC did *not* cancel the contract, (2) AGC continued purchasing dolomite from MidAtlantic through the end of the contract's term, and (3) AGC ceased purchasing dolomite only *after* the contract had expired.

2.  Whether the District Court wrongly refused to instruct the jury that, to find for MidAtlantic on its contract claim, the jury needed find that there was an enforceable (i.e., unexpired) contract in place at the time of the alleged breach.

3.  Whether the District Court erred in giving a jury instruction that added a new trigger to the take-or-pay clause—one that imposed obligations on AGC if it "called for or authorized" MidAtlantic to request a dolomite shipment from Spain—where this purported triggering condition appears nowhere in the parties' agreement.

4.  Whether the District Court erred in placing the burden on AGC, the defendant buyer, to demonstrate that MidAtlantic's dolomite did *not* conform to contract specifications where the undisputed evidence showed that AGC had rejected the dolomite.

5.  Whether the District Court erred in denying AGC's repeated motions for a mistrial where the District Court constantly interrupted AGC's examination of witnesses, interposed its own questions that were hostile to AGC, and was openly antagonistic to AGC's counsel.

2

<u>STATEMENT OF THE CASE</u>

This UCC case concerns a written contract to supply dolomite, a raw material used in glass manufacturing.  (JA 697-702.)  Appellant AGC Flat Glass North America, Inc. ("AGC"), a glass manufacturer, was the buyer.  (*Id.*)  Appellee MidAtlantic International, Inc. ("MidAtlantic"), a middleman, was the seller.  (*Id.*)  The dolomite was for AGC's factory in Kingsport, Tennessee.  (*Id.*)

*Dolomite and the 30-Mesh Specification*

Dolomite, a crystalline mineral, is used in glass manufacturing. (JA 351-52.)  As a mining product, dolomite often contains contaminants that can cause defects in the glass produced from it.  (JA 419.)  Among other things, dolomite may contain tiny acid-insoluble particles, which can cause "stone" defects.  (JA 353-54, 356-57.)

At the times relevant to this case, AGC's Kingsport factory produced glass for solar panels.  (JA 216-17.)  Solar panels are often used in the desert, where they are exposed to temperature extremes. (JA 222-23.)  Stone defects in this thermally stressed glass can break it. (JA 223.)  As Isaac Overbay, Jr., a former AGC manager, explained: "One of the worst things that can happen is to have a stone in solar glass."  (JA 222.)

3

AGC had detailed specifications for the dolomite that it used at its Kingsport plant.  (JA 693.)  Relevant here, the specifications stated the size of allowable stones.  (*Id.*)  AGC uses hydrochloric acid to test for stones.  (JA 367, 409-10.)  Dolomite dissolves in acid.  (JA 410.)  So the specifications dictated that the "acid-insoluble particles" in the dolomite not exceed a certain size: "no acid insoluble particle shall be coarser than 30 mesh."[1]  (JA 693.)

### The Parties' Contracting History

MidAtlantic and its affiliated entities had supplied dolomite to AGC since 1997.[2]  (JA 229.)  MidAtlantic obtained its low-iron dolomite from a quarry in Spain.  (JA 148.)  After shipping the dolomite in bulk across the Atlantic, MidAtlantic stored it in a warehouse that it leased in Norfolk, Virginia.  (JA 103.)  From there, the dolomite traveled by railcar—or sometimes truckload—to AGCs Kingsport factory.  (JA 105-06.)

---

[1] "30 mesh" denotes a mesh with openings that are 0.6mm in diameter.

[2] AGC initially bought the dolomite from Midatlantic Minerals, Inc., an affiliate of MidAtlantic.  In 2000, the parties' switched this arrangement so that AGC bought from Midatlantic.  (JA 231.)

To order dolomite from MidAtlantic, AGC issued blanket purchase orders for each calendar year, indicating price and an estimated annual usage.  (JA 309-10, 697-702.)  AGC followed this up with monthly purchase orders for specified dolomite quantities to be sent by rail.  (JA 107, 237, 458, 727-31, 734-39.)  Title passed from MidAtlantic to AGC when the dolomite was loaded onto the railcars in Norfolk.  (JA 698.)  At the times relevant to this dispute, AGC did *not* purchase shiploads of dolomite from Spain; it ordered specified quantities (usually measured in railcars) from MidAtlantic's storage facilities in Norfolk.

In 2008, MidAtlantic wrote AGC asking it to extend the parties' supply arrangement until the end of 2010.  (JA 643.)  The letter also proposed a "take or pay" clause wherein AGC—if it stopped purchasing dolomite—would agree to buy whatever dolomite remained in MidAtlantic's Chesapeake warehouse.  (*Id.*)  At trial, Jose Boves, one of MidAtlantic's principals at the time, explained that he insisted on the take-or-pay provision because of a May 2008 experience with AGC at a plant in Quebec wherein AGC suddenly stopped production, leaving MidAtlantic with leftover product.  (JA 160.)  AGC signed the letter

agreement, and included the take-or-pay clause in its subsequent purchase orders.  (JA 160, 697-98.)

On June 3, 2010, Dana Smith, MidAtlantic's director, emailed Lorrie Cooper, AGC's purchasing director, seeking to extend the agreement for another three years.  (JA 645-47.)  Cooper would not extend it for three years, but agreed to a one-year extension:

> I cannot commit for 3 more years at this time, but I can easily commit for another year.  Go ahead and order the next vessel and extend the contract for another year.

(JA 646.)  The parties agreed to use their email exchange as an extension to their agreement.  (JA 645-46.)  Thus, AGC and MidAtlantic extended the supply agreement through the end of 2011.

*The Blanket Purchase Order for 2011*

The governing instrument in this case is a blanket purchase order that AGC issued to MidAtlantic on October 19, 2010.  (JA 98; 697-702.) In it, MidAtlantic agreed—consistent with the parties' one-year extension—to supply AGC with "glass grade low iron dolomite" for the calendar year 2011." [3] (JA 697.)  The purchase order estimated that

---

[3] The purchase order language is in all upper case letters.  To enhance readability, this brief has converted the language to ordinary case.

AGC would order 13,000 tons for 2011 but that "[a]ctual consumption may increase or decrease depending on manufacturing needs." (*Id.*)

The October 19, 2010 purchase order states that "[e]ither party may cancel this agreement at any time with 30 days written notice." (*Id.*) But it also included a take-or-pay clause that required AGC to purchase leftover dolomite if, but only if, AGC *cancelled* the agreement or *stopped buying* dolomite:

> In the event AGC decides to cancel this agreement or decides to stop buying dolomite for whatever reason, AGC will pay MidAtlantic International for any dolomite remaining in storage at the warehouse in Norfolk, VA, and/or for any dolomite that has been previously ordered and is under production at the quarry and/or in transit on the vessel from the loading port to Norfolk, VA. The total amount of dolomite shall not exceed 15,000 ST. Payment shall be made within 10 days from date of invoice.

(JA 697-98.) Those were the only two conditions that triggered AGC's obligation to buy leftover dolomite. Relevant here, the mere fact that AGC approved MidAtlantic to order a shipload of dolomite from Spain

did not trigger AGC's obligation under this clause. Nor did the contract's expiration at the end of 2011.[4]

The purchase order contained detailed specifications for the dolomite that MidAtlantic was to supply. (JA 699.) Relevant here, it states that "no acid insoluble partical [sic] shall be coarser than 30 mesh." (*Id*.) Although title to the dolomite passed to AGC only when the dolomite went into rail cars for shipment to Kingsport, the purchase order gave AGC the right to inspect the dolomite at MidAtlantic's warehouse: "AGC reserves the right to verify the product purchased herein at the suppliers facility prior to packing and shipment." (JA 697-98.)

### MidAtlantic Orders a Shipload of Dolomite in Mid-2011

2011 was the last year of the contract between AGC and Midatlantic. (643, 645.) Jenny Seguin, AGC's purchasing manager, wanted to ensure that MidAtlantic had enough dolomite on hand to supply AGC through the end of the year. (JA 654.) So she told Isaac Overbay that she wanted to "have Dana [Smith] order another vessel

---

[4] The take-or-pay clause does not contain any term stating that its obligations survived the contract's expiration.

that will supply through first of the year." (*Id.*)  Overbay approved this, and Seguin told Smith "to order another vessel."  (JA 653.)

Unlike the similar exchange in 2010, however, AGC did not agree to extend the contract for another year.  (*Compare* JA 646 and JA 653.)  Indeed, MidAtlantic never even *asked* AGC to extend the contract beyond 2011.  (JA 280.)  Thus, under the contractual arrangement in place, AGC had not agreed to purchase any dolomite from MidAtlantic after December 31, 2011.  (JA 456-57.)  And as the Seguin-Overbay-Smith email chain shows, AGC requested an additional vessel simply to ensure an adequate dolomite supply through the contract's expiration on December 31, 2011.  (JA 654.)  MidAtlantic ordered another dolomite shipload from Spain.  The ship arrived in June 2011 and MidAtlantic stored the dolomite at its leased warehouse in Norfolk.  (Trial Transcript ("Tr.") at 111.)

### AGC Traces the Source of Glass Defects to the Dolomite Supplied by MidAtlantic

AGC had two furnaces at its Kingsport plant: a gas-fired furnace ("K1"), and an electric-melt furnace ("K3").  (JA 213.)  AGC rebuilt K3 in early 2011.  (JA 425.)  After K3 resumed production, AGC noticed a high number of stones in glass coming off the line and began receiving

9

customer complaints about it. (JA 218-19, 418.) AGC initially thought that this might be from particles sloughing off the furnace's walls, but quickly ruled this out as a source of the stones. (JA 449.) It also ruled out the rail cars as a contamination source. (JA 660.)

Instead, analysis revealed that the stone defects were "spinel," an acid-insoluble material containing alumina and magnesium oxide. (JA 356-57, 402-04.) AGC then began looking at the raw materials and testing the items that potentially contained stones: dolomite, silica sand, and aragonite. (JA 405.) These tests were performed at a lab in Japan run by AGC's corporate grandparent, Asahi Glass, Ltd.

On early September 2011, the Japanese lab sent AGC a report stating that the source of the spinel was dolomite supplied by MidAtlantic. (JA 406, 407-08, 420.) AGC told MidAtlantic about this report. (JA 421-22, 460.) Meanwhile, AGC continued to test the dolomite—finding spinel particles greater than 30 mesh in the material that MidAtlantic had supplied. (JA 410, 424, 436.)

In mid-November 2011, AGC gradually switched the K3 electric-melt furnace to another source of dolomite, from Italy, to see whether

that would resolve the problem.[5]  (JA 359-62.)  It did.  The glass coming off the K3 line no longer had the same problems with stone defects that it had had when AGC was using MidAtlantic's dolomite.  (JA 362.)

*Expiration of Contract and AGCs Rejection of*
*Already-Shipped Dolomite*

Nevertheless, AGC continued to request railcar loads of dolomite—and MidAtlantic continued to send them—through December 2011.[6]  (JA741-44.)  MidAtlantic invoiced AGC for four dolomite shipments, three by railcar and one by truck, that occurred in December 2011.  (JA 489-98, 746-54.)  AGC paid those invoices in January 2012. (JA 746.)

As noted above, the parties' contract expired on December 31, 2011.  Nearly a month later, on January 27, 2012, AGC wrote MidAtlantic stating that its dolomite was defective, requesting that MidAtlantic remove the already shipped dolomite from AGC's facility,

---

[5] AGC continued to use MidAtlantic's Spanish dolomite on K1, which—using a different process—did not have problems with spinel defects. (JA 364-65.)  AGC shut down the K1 furnace at the end of 2011. (JA 427.)

[6] This was for use in AGC's K1 gas-fired furnace.  As noted *supra*, note 5, the different process used in K1 resulted in fewer stone defects from the Spanish dolomite.

and asking MidAtlantic to reimburse AGC for its expenses. (JA 674.) MidAtlantic did not do this. Instead, it invoiced AGC for $724,479.58, representing the price of the 4766 tons of dolomite that remained at MidAtlantic's Norfolk warehouse. (JA 649.) In a second invoice, MidAtlantic increased this amount by $72,880.50, representing 479 additional tons. (JA 651.) Neither side did what the other demanded, giving rise to this lawsuit.

*The District Court Enters Partial Summary*
*Judgment Regarding the Controlling Instrument*

In its First Amended Complaint, MidAtlantic alleges that "AGC breached its agreement with Plaintiff by refusing to accept dolomite that conforms to the contract" and by "refusing to pay for the 5,245.79 short tons of dolomite remaining in the warehouse in Norfolk." (JA 30.) MidAtlantic further alleges that it "has performed all of its obligations under the terms of the agreement with AGC." (*Id.*)

Before trial, AGC filed a Motion for Partial Summary Judgment, seeking, among other things, a determination that the specifications

12

and terms in AGC's purchase orders embodied the parties' agreement.[7]
The District Court granted this portion of AGC's motion, ruling that
"those purchase orders and the attached Terms and Conditions
constitute the contract in this case." (JA 94-95.) The District Court also
held that the parties' course of dealing could not alter the agreement's
specifications for dolomite, stating that "there was nothing unclear
about the 30 mesh requirement or the other specifications for the
dolomite that required explanation or supplementation." (JA 98.)

### *Trial and Verdict*

The District Court presided over a six-day trial in February 2014.
As related in more detail *infra*, Section V, the District Court—Judge
Doumar—constantly interrupted AGC's counsel's examination of key
witnesses, criticized AGC's counsel repeatedly in front of the jury, and
interposed questions to witnesses that systematically favored
MidAtlantic.

---

[7] The District Court had previously dismissed this case on *Colorado River* abstention grounds; a decision that this Court reversed. *See MidAtlantic Int'l, Inc. v. AGC Flat Glass North America, Inc.*, No. 12-1745, 497 F. App'x 279 (4th Cir. 2012). The abstention issues raised in that appeal are unrelated to the issues now before the Court.

13

At the close of evidence, the District Court denied the parties' cross-motions for judgment as a matter of law on MidAtlantic's contract claim.  (JA 552-54.)  The District Court also rejected nearly all of AGC's instructions, and gave several instructions over AGC's express objections.

To begin with, the District Court rejected AGC's proposed instruction on the elements that MidAtlantic needed to satisfy in order to prevail on its breach-of-contract claim under the take-or-pay clause. AGC asked the District Court to instruct the jury that, to find for MidAtlantic on its contract claim, the jury needed to find an "enforceable"—i.e., non-expired—contract between the parties.[8]  (JA 564-65.)  Second, the District Court rejected AGC's proposed instruction on the burden of proof. (JA 563-64.)  This instruction stated that MidAtlantic bore the burden of proving all of the elements of its contract claim, which included the requirement that it show that the

_____

[8] The relevant portion of AGC's proposed instructions stated that "MidAtlantic  has the burden of proving . . . MidAtlantic and AGC had an enforceable contract."  (JA 55.)

14

leftover dolomite met contract specifications.[9]  Third, the District Court

rejected AGC's proposed instructions regarding tender, acceptance, and

rejection of goods under the UCC.[10]  (JA 568-69, 589-92.)

Rather than use AGC's or MidAtlantic's proposed instructions, the

District Court came up with its own.  The District Court's instructions

predicated AGC's take-or-pay clause liability on whether AGC

requested a shipload of dolomite in 2010 or 2011:

> As to dolomite in the warehouse in Norfolk,
> Virginia, at the end of 2011 or early January
> 2012, you must decide whether AGC called or
> authorized MidAtlantic to have dolomite in Spain
> shipped to MidAtlantic.

(JA 627.)  Thus, the District Court placed the initial burden on

MidAtlantic to show that the leftover dolomite was from a shipload

ordered in 2010 or 2011:

> MidAtlantic has the burden to prove by a
> preponderance of the evidence that, one, the
> shipment from Spain was called for or authorized
> by AGC or someone on their behalf; two, that it
> was called for or authorized during 2010 or 2011;

---

[9] AGC's proposed instruction stated, in relevant part, that "MidAtlantic has the burden in a civil action, such as this, to prove every essential element of Plaintiff's claim by a preponderance of the evidence." (JA 46.)

[10] The rejected instructions—D18-D22, and D24—appear in the Joint Appendix at pages 60-64 and 66.

and, three, that the dolomite in the warehouse
was from that ship from Spain.

(*Id.*) The District Court then instructed the jury that, if MidAtlantic

established these facts—facts that were largely uncontested—*AGC*, the

defendant, had the burden of proving that the dolomite was

*non*conforming:

> If you find that MidAtlantic has carried its
> burden of proof, then you must determine if AGC
> has proven by a preponderance of the evidence
> that the dolomite in the warehouse in Norfolk,
> Virginia, at the end of 2011 or the beginning of
> 2012 contained acid insoluble particles coarser
> than 30 mesh.

(JA 627-28.) The District further instructed the jury that "If AGC fails

to carry its burden of proof while MidAtlantic carries its burden of

proof, then you must find for MidAtlantic." (JA 628.) The District

Court did *not* instruct the jury to determine whether, at the time AGC

ceased buying dolomite from MidAtlantic, the parties' contract was still

in effect and enforceable.

While deliberating, the jury asked the District Court what

evidence it could "consider[] in determining whether the defendant had

reached its burden of proof." (JA 632.) The District Court responded

16

that the jury could consider all the evidence in the case, in accordance with the Court's instructions.  (JA 634.)

The jury returned a verdict in MidAtlantic's favor for $797,360.08, to which the District Court added $6,793.61 for an undisputed claim, and $97,952.53 for prejudgment interest, for a total judgment amount of $902,106.22.  (JA 638, 756, 763.)

This appeal followed.  (JA 757.)

## SUMMARY OF ARGUMENT

This court should reverse for three independently sufficient reasons.  **First**, MidAtlantic's claim fails as a matter of law because AGC had no obligations under the take-or-pay clause.  The obligations under this clause had two and only two triggers: cancellation of the contract and cessation of dolomite purchases.  Neither of those events occurred before the contract's expiration on December 31, 2011.  And the contract's expiration relieved AGC of any further obligations under the take-or-pay clause.  So the District Court should have granted judgment as a matter of law to AGC.  Instead of doing so, however, the District Court *sua sponte* created a new trigger for the take-or-pay clause—one that had no basis in the parties' agreement.  And it refused

17

to allow AGC to argue to the jury that it had no obligations under an expired contract.  This Court should correct these legal errors and order that final judgment be entered for AGC.

**Second**, the District Court improperly shouldered AGC with the burden of showing that the dolomite did *not* comply with the contract's requirements.  Under basic contract law, the plaintiff in a contract claim—here, MidAtlantic—bears the burden of showing that it met its own contractual obligations.  Thus, to recover against AGC, MidAtlantic needed to show that its goods were conforming.  The UCC shifts the burden of proof to the buyer only where the buyer has "accepted" the goods.  In the present case, AGC did not accept the leftover dolomite: it explicitly rejected it.  Indeed, MidAtlantic never pled or maintained that AGC accepted the goods.  So the burden remained on MidAtlantic to show that the dolomite met contract specifications.  The District Court, however, wrongly placed the burden on AGC to show that the dolomite did not meet specifications.  Again, reversible legal error.

**Third**, the District Court deprived AGC of fair trial by (1) interrupting the examination of witnesses literally hundreds of times, (2) asking questions—many of them leading and pointed—that

18

were systematically hostile to AGC, and (3) disparaging AGC's counsel in front of the jury.  Counsel recognizes that reversal for judicial misconduct is an extraordinary remedy.  But this is an extraordinary case.  No impartial observer can read the trial transcript and conclude that AGC was given a fair opportunity to present its case to the jury.  Thus, even apart from the District Court's many legal errors, this Court should reverse.

<u>ARGUMENT</u>

## I. MidAtlantic's contract claim under the take-or-pay clause failed as a matter of law because the contract expired before AGC ceased buying dolomite from MidAtlantic.

### A. Standard of Review.

This Court reviews "de novo the district court's denial of a Rule 50 motion for judgment as a matter of law, considering the evidence in the light most favorable to . . . the nonmoving party." *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 332 (4th Cir. 2013).

### B. The undisputed evidence shows that AGC complied with the contract through the contract's expiration on December 31, 2011.

At the close of evidence, the District Court denied AGC's motion for judgment as a matter of law on MidAtlantic's contract claim under

19

the take-or-pay clause.  AGC contended that the undisputed facts showed that it had complied with its obligations under the take-or-pay clause through the contract's expiration.  Because those obligations ceased when the contract expired, there could be no claim for breach of contract.

AGC based its legal argument on bedrock contract principles. Under Tennessee law,[11] a court reviewing a contract claim must "ascertain the intention of the parties based upon the usual natural and ordinary meaning of the contract language." *Marcum v. Ayers*, 398 S.W.3d 624, 627 (Tenn. Ct. App. 2012) (quoting *Kafozi v. Windward Cove, LLC*, 184 S.E.3d 693, 698 (Tenn. Ct. App. 2005)).  Courts presume the parties' intent "to be that specifically expressed in the body of the contract." *Id.*  When construing a contract, a court must "ascertain the meaning and intent of the parties as expressed in the language used and . . . give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.*

---

[11] The parties agree that Tennessee substantive law governs this diversity action.

Where, as here, the contract language is unambiguous, "the literal meaning of the language controls the outcome of the dispute." *Id.* Absent "mistake or fraud, the courts will not create or rewrite a contract simply because its terms are harsh or because one of the parties was unwise in agreeing to them." *Id.* at 629 (quoting *Towe Iron Works, Inc. v. Towe*, 243 S.W.3d 562, 569 (Tenn. Ct. App. 2006)).

"It is axiomatic in contract law that parties to an agreement are relieved of their mutual obligations upon termination of the agreement." *NLRB v. Cone Mills Corp.*, 373 F.2d 595 (4th Cir. 1967). *See also Barnes v. Hamilton County Department of Education,* 2005 WL 240604, No. E2003-02645-COA-R3-CV, at *6 (Tenn. Ct. App. Feb. 2, 2005) (holding that the plaintiff "cannot now seek to enforce the terms of a contract that has expired"); *Litton Fin. Printing Division v. NLRB*, 501 U.S. 190, 206 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied."); *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 646 (7th Cir. 2006) ("[A]n expired contract releases all its parties from their respective contractual obligations."); *Seven Resorts,*

*Inc. v. United States*, 112 Fed. Cl. 745, 785 (Fed. Cl. 2013) ("A contract generally terminates at the expiration of its term.").

It follows that there can be no contract claim if the contract expired before the alleged breach. *CBX Technologies, Inc. v. GCC Technologies, LLC*, 533 Fed. Appx. 182, 184 (4th Cir. 2013) ("Having determined that no breach occurred before the Teaming Agreement expired, we conclude that the district court properly determined that CBX could not state a viable breach of contract action under the Teaming Agreement."); *Alpha Telecommunications, Inc. v. International Business Machines Corp.*, 194 Fed. Appx. 385, 390 (6th Cir. 2006) (holding that defendant was not liable for repudiating contract because contract "had already expired according to its own terms" before the alleged repudiation); *Sarah Lee Corp. v. Quality Mfg.*, 201 F. Supp. 608, 612-13 (M.D.N.C. 2002) (holding that defendant did not violate contract to order shirts where contract expired before the alleged breach); *Black & Decker (US), Inc. v. Ali Indus., Inc.*, 08-1015, 2008 WL 2951099 (W.D. Tenn. July 24, 2008) (holding that supply agreement with take-or-pay provision was not in effect at time of the alleged breach).

In *Black & Decker*, for example, a tool manufacturer agreed to purchase its sandpaper requirements from an abrasives supplier. 2008 WL 2951099, at *1. As in the present case, the supply agreement had a take-or-pay provision. It stated that if the tool manufacturer "seceded" from the agreement, it would be liable "for all inventories on certain products and one year on selective sku's that will be determined at a later date and reviewed from time to time." *Id.* at *2. The agreement expired on December 31, 2007. After December 31, 2007, the tool manufacturer switched suppliers. The original abrasives supplier claimed that this violated the contract's take-or-pay clause and invoiced the tool manufacturer for $700,000 worth of leftover products—products the supplier had stockpiled in anticipation of the tool manufacturer's 2008 needs. The district court held that the contract did *not* govern the parties' dispute because the alleged breach occurred after the contract had expired and "there is no indication in the Supply Agreement that the parties' rights and obligations would survive its expiration." *Id.* at *4. Accordingly, it refused to apply the expired agreement's terms, including the take-or-pay provision.[12]

---

[12] The precise issue before the court was whether the arbitration

*(note continued on following page . . .)*

23

In the present case, as in *Black and Decker*, the undisputed evidence showed that AGC met its obligations under the take-or-pay clause up to and including the contract's expiration at the end of 2011.[13] As of January 1, 2012, AGC's obligations under that provision ceased.

The governing contract provision is unambiguous. By its express terms, AGC's obligations were triggered by two—and only two—events:

> *In the event AGC decides to cancel this agreement or decides to stop buying dolomite for whatever reason*, AGC will pay MidAtlantic International for any dolomite remaining in storage at the warehouse in Norfolk, VA, and/or for any dolomite that has been previously ordered and is under production at the quarry and/or in transit on the vessel from the loading port to Norfolk, VA. The total amount of dolomite shall not exceed 15,000 ST. Payment shall be made within 10 days from date of invoice.

(JA 697-98) (emphasis added). Thus, to prevail under this provision, MidAtlantic needed to show that—at some point before the end of 2011—AGC either (1) cancelled the agreement or (2) stopped buying

---

*(. . . note continued from previous page)*
provision in the agreement applied. But in deciding that question, the district court addressed whether the alleged breach of the take-or-pay clause arose under the agreement.

[13] It was undisputed that the agreement expired on this date and that there was no extension beyond December 31, 2011. (JA 280.)

dolomite from MidAtlantic.  MidAtlantic did not establish a prima facie case on either of those conditions precedent.

To begin with, there was no evidence that AGC cancelled the agreement before it expired.  There is no correspondence before that date purporting to cancel the contract or otherwise sever the parties' relationship.  Nor is there any evidence of a conversation cancelling the agreement.  It was not until January 2012—i.e., after the contract's expiration—that AGC severed the parties' commercial relationship.  (JA 674.)  Thus, MidAtlantic could not base its contract argument on the take-or-pay clause's "cancellation" trigger.

That leaves only the "stop buying" trigger.  Here, however, the undisputed evidence showed that AGC continued to purchase dolomite from MidAtlantic through December 2011.  AGC's purchasing director, Lorrie Cooper, testified that AGC purchased three railcars and one truckload of dolomite from MidAtlantic in December 2011.[14]  (JA 489-

---

[14] AGC anticipates that MidAtlantic will cite Cooper's testimony that the purchase order with the November 30th required date was when AGC stopped buying dolomite.  (JA 480)  But as Cooper's later testimony revealed, there were shipments and purchases in December—AGC didn't issue a separate purchase order for them,

*(note continued on following page . . .)*

98.)  MidAtlantic's own invoices, admitted as evidence, show shipping dates of December 6, 7, 9, and 10.  (JA 747-54.)  AGC made those purchases even though (1) it already had four loaded railcars at the Kingsport plant and (2) it was reducing consumption due to the K3's switchover to Italian dolomite.  (JA 741-44.)  Finally, AGC paid for those shipments with a check dated January 27, 2012.  (JA 746.)  AGC indisputably was continuing to purchase MidAtlantic's dolomite when the contract expired.

Although AGC did eventually stop purchasing dolomite from MidAtlantic, this was only *after* the contract had expired.  (JA 674.)  The take-or-pay provision, however, does not contain a survival clause specifying that its obligations outlive the contract.  Nor does it have a clause triggering its obligations upon the contract's expiration.  Because the contract expired without AGC having breached the take-or-pay provision, and because AGC's obligations under that provision ceased upon the contract's expiration, AGC was entitled to judgment as a

---

*(. . . note continued from previous page)*
simply telling MidAtlantic just to add the shipments to the November purchase order.  (JA 489-98, 741-44.)

26

matter of law on MidAtlantic's contract claim.  The District Court erred in denying AGC's motion.

## II.    The contract-expiration issue was, at the very least, a jury question.

### A.    Standard of Review

"This Court reviews a district court's jury instructions decision for an abuse of discretion."  *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013).

### B.    AGC presented evidence that it met its contract obligations up to, and through, the contract's expiration.

Even if there were a legitimate factual issue about whether AGC continued to purchase dolomite through the end of 2011—and there was not—AGC was at least entitled to a jury instruction on the issue.  AGC asked the District Court to instruct the jury that it had to find an "enforceable contract" between the parties at the time of the alleged breach.  As AGC explained, it wanted this instruction so that it could argue that the agreement's expiration relieved AGC of any further obligations under the take-or-pay clause.  (JA 564-65.)

The District Court, however, did not give the requested instruction.  This, too, was error.  A district court abuses its discretion

27

where it rejects an instruction that: "'(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case.'" *Kivanc*, 714 F.3d at 794 (quoting *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir.2011)).  In evaluating whether a district court has erred in rejecting an instruction, this Court assesses whether "the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.*

In this case, AGC's proposed instruction correctly stated that, in order to find for MidAtlantic on its breach-of-contract claim under the take-or-pay clause, the jury had to find that "MidAtlantic and AGC had an enforceable contract." (JA 55.)  This issue was *not* substantially covered by the instructions that the District Court actually gave the jury.  The District Court did not instruct the jury that they had to find that the contract was in force at the time of the alleged breach.[15]  (JA

---

[15] Indeed, as noted *infra*, Section III.A, the District Court erroneously instructed the jury that the take or pay clause was implicated simply if

*(note continued on following page . . .)*

28

626-28.) The District Court's failure to instruct on this issue did more than "seriously impair[]" AGC's ability to present its case—it gutted AGC's case. AGC's principal argument was that it had complied with the contract's terms through the contract's expiration at the end of 2011. (JA 323-25.) AGC stopped buying dolomite from MidAtlantic only after the contract had expired, at which point AGC no longer had any obligations under the take-or-pay clause. By failing to instruct the jury on the enforceable-contract issue, the District Court prevented AGC from presenting this argument to the jury. The District Court thus abused its discretion by disallowing AGC's proposed instruction.

---

*(. . . note continued from previous page)*
AGC "called for or authorized" a shipment of dolomite from Spain at any time in 2010—before the purchase order at issue in this case was issued—or 2011.

III. **The District Court's jury instructions rewrote the contract to add a new trigger for the take-or-pay clause.**

   A. **The District Court wrongly instructed the jury that asking MidAtlantic to order a shipment of dolomite triggered AGC's obligations under the take-or-pay clause.**

The District Court compounded its error by *sua sponte* giving an instruction that effectively created a *new* trigger for AGC's obligations under the take-or-pay clause—one that was nowhere to be found in the parties' agreement, and one that greatly expanded the clause's scope.[16] It told the jury that it could find AGC liable under the take-or-pay clause for the leftover dolomite if "AGC called or authorized MidAtlantic to have dolomite in Spain shipped to MidAtlantic." (JA 627.)

This instruction has no basis in the parties' agreement.[17] The take-or-pay clause's conditions precedent are explicit and unambiguous. AGC's take-or-pay obligations arise only "[i]n the event AGC decides to

---

[16] The District Court's finding instruction was not requested by either party. The language of the take-or-pay clause is express, explicit, and unambiguous. As set forth below, it does not contain the trigger that the District Court included in the jury instructions.

[17] As noted above, the District Court previously ruled that "those purchase orders and the attached Terms and Conditions constitute the contract in this case." (JA 94-95.)

cancel this agreement or decides to stop buying dolomite for whatever reason." (JA 687.) Cancellation of the contract and cessation of orders are the only two triggers. Period.

Although the clause mentions dolomite shipments, this concerns only the scope of materials for which AGC would have to pay *if* either of the conditions precedent had been met. It states that, in such a circumstance, AGC would have to pay "for any dolomite that has been previously ordered and is under production at the quarry and/or in transit on the vessel from the loading port to Norfolk, VA."[18] But this language comes into play only if AGC has cancelled the contract or stopped buying dolomite. And it only defines *what* AGC has to buy, not *when* it must buy it.[19] The District Court's instruction transmuted a provision specifying the payment obligations under the take-or-pay

---

[18] This proviso is irrelevant to this case, as the only dolomite for which MidAtlantic seeks payment is dolomite that was in the warehouse in early 2012. There was no dolomite in transit at that time.

[19] Indeed, the District Court's trigger renders the other two triggers superfluous. Once a shipment is "called" for or "authorized," AGC must pay for it. What happens later in the parties' relationship thus becomes irrelevant.

clause into a condition precedent for imposing those obligations in the first place. It transformed a "then" clause into an "if" clause.

That was error. Where, as here, parties enter into an unambiguous written contract, they are bound by its plain meaning. Courts are not free to change the contract's terms to suit their ideas of what would be a better bargain. *Marcum*, 398 S.W.3d at 629 (quoting *Towe Iron Works, Inc.*, 243 S.W.3d at 562 ("[T]he courts will not create or rewrite a contract simply because its terms are harsh or because one of the parties was unwise in agreeing to them.").

Here, the agreement addresses the specific circumstances that triggered AGC's payment obligations under the take-or-pay clause, identifying two, and only two, such conditions. Those triggering conditions say nothing about "AGC call[ing] or authoriz[ing] MidAtlantic to have dolomite in Spain shipped to MidAtlantic." (*Compare* JA 627 with JA 697.) That was the District Court's invention.[20] The District Court erred in creating, out of whole cloth, a

---

[20] MidAtlantic never suggested—either in a pleading or at trial—the language used by the District Court.

third condition precedent—one that has no basis in the parties'
agreement.

This error could not have been more prejudicial to AGC. It was
undisputed that in April 2011 Jenny Seguin, AGC's purchasing
manager, told Dana Smith that MidAtlantic was "good to order"
another dolomite shipment from Spain. (JA 203-04, 564, 653-54.) And
it was undisputed that the leftover dolomite came from shipments in
2010 and 2011. So the District Court's instruction was, in effect, a
directed verdict; it made MidAtlantic's victory on this issue a foregone
conclusion.

### B. AGC's interpretation of the take-or-pay clause makes commercial sense.

At the time of its ruling, the District Court did not explain or
justify its instruction, presenting it merely as *ipse dixit*. (JA 553-54.)
But it appears that the District Court believed that adding this extra
condition was necessary in order to avoid rendering the take-or-pay
provision futile. During argument on the issue, for example, the
District Court opined that AGC's interpretation—under which AGC's
obligations under the take-or-pay clause ceased upon the contract's
expiration—"would make the clause worthless." (JA 334.)

33

This is not so. The parties had entered into a long-term supply agreement. MidAtlantic guaranteed the price. In exchange, AGC promised to purchase dolomite from MidAtlantic. The take-or-pay clause protected MidAtlantic from early, sudden, and unpredictable cancellation or cessation of orders by AGC—something MidAtlantic had experienced earlier in its contracting history with AGC. (JA 160.) For example, if AGC had cancelled one month into the agreement, AGC would have had to pay for the dolomite stored, in transit, or in process at the time. The take-or-pay provision thus protected MidAtlantic from contingencies against which it otherwise was powerless to protect itself.

The contract's *expiration*, however, was not an early, sudden, or unpredictable event. MidAtlantic easily could have protected itself against this ordinary end-of-term problem: either by requesting that AGC extend the agreement—as it had in the past[21]—or by ordering only as much dolomite from the mine in Spain as would be necessary to supply AGC through the contract's expiration.[22] Because the contract's

---

[21] *See* JA 645-46.

[22] Indeed, the email chain that Seguin forwarded to Smith on April 11, 2011, requesting the shipment, made it clear that this was only for
*(note continued on following page . . .)*

expiration was an event for which MidAtlantic could have—and should have—planned ahead, it did not need the take-or-pay provision to be triggered upon its occurrence.

AGC's interpretation thus does not render the take-or-pay clause "worthless." It protected MidAtlantic against unforeseen and premature cessation of dolomite orders, such as had occurred in Quebec. What it did *not* do—and what the District Court wrongly held it did— was ensure that AGC buy every grain of Spanish dolomite that MidAtlantic ever ordered.

*    *    *

It is a fact of commercial life that a supplier often risks being left with excess unmarketable goods at the end of a supply contract's term. MidAtlantic could have protected itself against this foreseeable result by insisting on a provision that triggered the take-or-pay clause upon the contract's expiration, thereby forcing AGC to pay for all of the dolomite that MidAtlantic had sent to its warehouse. It did not do so. Nor does the record reflect that AGC would have agreed to such terms.

---

*(. . . note continued from previous page)*
"supply through first of the year," i.e., only to the end of the contract period. (JA 653-54.)

By rewriting the contract, the District Court's instruction gave
MidAtlantic the benefit of such a provision without MidAtlantic having
to pay for it. That was reversible error.

### IV. The District Court wrongly placed the burden on AGC to show that MidAtlantic's dolomite did not meet specifications.

The District Court committed additional reversible error by
instructing the jury that AGC, the defendant, had the burden of proving
that MidAtlantic's dolomite did not meet contract specifications. This
instruction violates both general contract law and the UCC provisions
governing burdens of proof.

As a general matter, a party suing for breach of contract has the
burden of proving that it substantially performed its own contractual
obligations: "Where plaintiff sues upon its contract, alleging
performance on its part, which performance is denied by defendant, it is
incumbent upon the plaintiff to prove performance, at least
substantially, of the contract according to its terms." *Aratex Servs., Inc.
v. Tennessee Commercial Warehouse*, 1993 WL 312675 (Tenn. Ct. App.
Aug. 18, 1993). *See also John H. Moore & Sons v. Adams*, 324 S.W.2d
499, 501 (Tenn. Ct. App. 1959) ("Complainant, suing on such promise,

had the burden of alleging and proving both the condition and the

performance of it.").

The UCC alters this common-law rule slightly, depending on

whether or not the goods have been "accepted."[23]  Where there has been

an acceptance, the burden shifts to the buyer to show that the goods are

nonconforming:

> The burden is on the buyer to establish any
> breach with respect to the *goods accepted*.

Tenn. Code Ann. § 47-2-607(4) (emphasis added).  But where, as here,

the buyer has *not* accepted the goods, the burden *remains on the seller*

to show that the goods conformed to the contract:

> [I]f the goods failed to conform, and if timely
> notice of rejection had been given to the seller . . .
> the burden would have remained upon the
> plaintiff seller, as at common law, to prove that it
> had performed the contract by producing and
> delivering conforming goods.

*Flowers Baking Co. of Lynchburg, Inc. v. R-P Packaging, Inc.*, 329

S.E.2d 462, 467 (Va. 1985).  *See also Miron v. Yonkers Raceway, Inc.*,

---

[23] A buyer "accepts" goods by representing to the seller "that the goods
are conforming or that he will take or retain them in spite of their
nonconformity" or by "fail[ing] to make an effective rejection."  Tenn.
Code § 47-2-606.  In the present case, MidAtlantic affirmatively alleges
that AGC did not accept the dolomite.  (JA 30.)

400 F.2d 112, 119 (2d Cir. 1968) ("Where goods are effectively rejected for breach of warranty, the burden of proving that they conform presumably remains on the seller, whereas upon acceptance the buyer has the burden to establish any breach.") (citing UCC § 2-607(4)).

In the present case, MidAtlantic's own pleadings affirmatively allege that AGC did *not* accept the leftover dolomite:

> AGC breached its agreement with Plaintiff by *refusing to accept dolomite* that conforms to the contract and refusing to pay for the 5,245.79 short tons of dolomite remaining in the warehouse in Norfolk as provided by the terms of the agreement.

(JA 30) (emphasis added).  And the undisputed evidence showed that AGC rejected the material, telling MidAtlantic that its dolomite failed to meet AGC's 30-mesh specification.  (JA 674.)  Given the absence of acceptance, the burden remained on MidAtlantic to show that the dolomite met the 30-mesh specification.

The District Court, however, incorrectly relieved MidAtlantic of this burden and imposed it on AGC.  Thus, it instructed the jury that:

> If you find that MidAtlantic has carried its burden of proof [to show that AGC approved MidAtlantic to order the shipment of the leftover dolomite], then *you must determine if AGC has proven by a preponderance of the evidence* that

38

> the dolomite in the warehouse in Norfolk,
> Virginia, at the end of 2011 or the beginning of
> 2012 contained acid insoluble particles coarser
> than 30 mesh.

(JA 627-28) (emphasis added). The District Court further instructed the jury that "If AGC fails to carry *its burden of proof* while MidAtlantic carries its burden of proof, then you must find for MidAtlantic." (JA 628.) (emphasis added). The District Court thus forced AGC to *dis*prove an element of MidAtlantic's own contract claim. The District Court offered no legal justification or authority to support its decision to place the burden of proof on AGC. Once again, it was just *ipse dixit*. (*See, e.g.*, JA 582-83, 587-88.) And, once again, the District Court committed clear legal error.

This error alone requires reversal. "'[T]he proper allocation of the burden of proof is an important procedural right.'" *Humphrey v. Humphrey*, 434 F.3d 243, 247 (4th Cir. 2006) (quoting *Bruner v. Office of Pers. Mgmt.*, 996 F.2d 290, 292 (Fed.Cir.1993)). "Generally, when a trial court applies the incorrect burden of proof in a civil case, appellate courts remand the case for a determination under the appropriate standard." *Humphrey,* 434 F.3d at 247 (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 292 (1982)). There is a "narrow exception" to this

rule where the evidence on the issue in question is so overwhelming—e.g., where the complaining party has not even met its burden of production—that remanding the case would "inevitably produce the same outcome under the correct standard." *Id.*

The present case does not fall under this "narrow exception." AGC presented fact-witness and expert-witness testimony that the dolomite that MidAtlantic supplied did not comply with the purchase order's 30-mesh requirement. (JA 410, 423,442-43.) Thus, for example, Masamichi Kawakami, an engineer at Asahi Glass Co., Ltd. (AGC's parent company) who tested the materials in autumn 2011, testified that the dolomite left materials on a 30-mesh screen even after being treated with hydrochloric acid:

> Q.    Okay.  And were there any materials left or that were captured by the 30 mesh sieve?
>
> A.    Yes, there was residue.

(JA 410.)  Likewise, MidAtlantic's expert, Andrew Kolbert—who holds a Ph.D. in chemical physics from MIT[24]—testified that, after his testing,

---

[24] (JA 441.)

the dolomite that AGC received from MidAtlantic left acid-insoluble
residue on a 30-mesh screen:

> Q.    Was what was left on the 30 mesh screen
> acid insoluble particles?
>
> A.    Yes.
>
> Q.    And were they coarser than 30 mesh?
>
> A.    Yes.

(JA 442-43.)[25]  There was, to be sure, some evidence on the other side.
MidAtlantic offered the deposition testimony of Gregory Bernard, an
employee at the Kingsport plant, who testified that his routine spot
checks did not reveal any acid-insoluble materials greater than 30 mesh
in the dolomite.  (JA 125-30.)

Viewing the evidence as a whole, however, the most that can be
said is that the record evidence on this issue "would have supported a
judgment for either side."  *Humphrey*, 434 F.3d at 248 (quoting *In re
Taxman Clothing Co., Inc.*, 905 F.2d 166, 171 (7th Cir.1990)).  But it is
precisely in such circumstances—where the evidence is in dispute and
the burden of proof is therefore potentially dispositive—that this Court

---

[25] Similar testimony appears at pages 796-97 of the trial transcript.

will vacate the judgment and remand the case for further proceedings.[26]
*Id.* The District Court's misallocation of the burden of proof in the
present case thus requires that this Court vacate the judgment.

### V. The District Court deprived AGC of a fair trial by disparaging AGC's counsel and by impeding AGC's examination of witnesses.

Finally, this Court should reverse because Judge Doumar's
interference with AGC's presentation of its case—extraordinary in both
quantity and quality—deprived AGC of a fair trial.

### A. Standard of Review.

This Court reviews for abuse of discretion a denial of a motion for
a mistrial based on judicial bias.[27] *United States v. Wilson*, 118 F.3d
228, 237 (4th Cir.1997).

---

[26] As noted above, the jury actually propounded a question to the Court
about the evidence AGC needed to establish to satisfy AGC's burden of
proof, querying: "May Spanish dolomite material located in Tennessee
that the jury determines to have been secured from the . . . Norfolk
warehouse . . . be considered in determining *whether the defendant has
reached its burden of proof*?" (JA 632) (emphasis added).

[27] Many of this Court's decisions on judicial bias have been decided
under a "plain error" standard because the appellant failed object at
trial. In the present case, however, AGC repeatedly objected to the
District Court's conduct and moved for a mistrial. (JA 292-93, 370,
374.) So the standard of review is abuse of discretion.

### B. A trial judge must preside impartially and must not unduly interfere with the presentation of evidence.

This Court repeatedly has observed that, "'[n]otwithstanding the broad discretion accorded trial judges,' a judge 'must maintain such a demeanor that 'every one shall recognize that what is said from the bench is the cool and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of the advocate.'" *United States v. Cherry*, 720 F.3d 161, 167 (4th Cir. 2013) (quoting *United States v. Godwin*, 272 F.3d 659, 676-77 (4th Cir. 2001)). A judge does not have an "impregnable cloak of immunity." *Godwin*, 272 F.3d at 677 (quoting *Wallace v. United States*, 281 F.2d 656, 665 (4th Cir. 1960)).

Thus, for example, there are limits on the extent to which a trial judge can *sua sponte* interrupt and interfere with proceedings. *United States v. Head*, 697 F.2d 1200, 1209 (4th Cir. 1982); *United States v. Cole*, 491 F.2d 1276, 1278 (4th Cir. 1974). There are limits on the nature and extent of a trial judge's examination of witnesses. *Godwin*, 272 F.3d at 677. And there are limits on the comments that a trial judge may direct at counsel in the jury's presence. *United States v. Cassiagnol*, 420 F.2d 868, 879 (4th Cir. 1970). As shown below, the

District Court overstepped all of these limits, depriving AGC of its right to a fair trial.

### C.  The District Court exhibited overt bias, impeded AGC's efforts to present its case to the jury, and deprived AGC of a fair trial.

#### 1.  The District Court's constant *sua sponte* interruptions impeded AGC's presentation of its case.

Take, first, the District Court's constant interruptions during AGC's examination of witnesses.  AGC acknowledges that a district court has the "discretionary prerogative—and duty on appropriate occasions—to intervene *sua sponte* in the proceedings." *Head*, 697 F.2d at 1210.   But it is equally beyond dispute that this privilege is circumscribed.  "Constant or persistent interruption of defense counsel may have the effect of contaminating the jury's verdict by indicating the judge's evaluation of the weight of the evidence and the merits of the defense." *Cassiagnol*, 420 F.2d at 879.  *See also United States v. Castner*, 50 F.3d 1267 (4th Cir. 1995) ("[T]he court 'must not create an appearance of partiality by continued intervention on the side of one of the parties or undermine[] the effective functioning of counsel through repeated interruption of the examination of witnesses.'") (quoting

*United States v. Norris*, 873 F.2d 1519, 1526 (D.C. Cir. 1989)). Where, as here, interruptions are so frequent that their "cumulative effect [is] pervasive and prejudicial" to a party, the case must be reversed. *Cole*, 491 F.2d at 1279.

In the present case, the District Court disrupted AGC's examination of key witnesses with scores of *sua sponte* objections, comments, questions, and critiques. For example, one of the key witnesses at trial was Dana Smith, MidAtlantic's director. The District Court interrupted AGC's cross-examination of Smith at least 28 times in a cross-examination spanning only 40 transcript pages (much of which was spent arguing points that the District Court had raised in its *sua sponte* interruptions).[28] (JA 344-84.) Although some interruptions

---

[28] *See* JA 273:13 (asking about exhibit); JA 274:25 (saying question is confusing); JA 275:9-13 (telling counsel to rephrase question); JA 275: 24-276:8 (asking whether counsel is going to read deposition to witness); JA 276:18 (telling counsel how to cross-examine witness with deposition transcript); JA 277:25-278:1 (admonishing counsel not to repeat witness's prior testimony); JA 278:8 (asking about exhibit); JA 279:5-9 (asking about exhibit); JA 279:14-16 (saying question is confusing); 352:3-4 (not allowing witness to read contract expiration date, saying document states what it states); JA 280:14-19 (saying that counsel should use "expiration" date rather than "termination" date); JA 281:4-11 (saying counsel should ask what witness did, not what the witness did not do); JA 282:1-283:22 9 (asking about exhibit); JA 284:4-285:4

*(note continued on following page . . .)*

just involved questions about whether exhibits had been admitted, most were either critiques of counsel or questions eliciting evidence that was favorable to MidAtlantic.  These interruptions far outnumbered the objections of opposing counsel.  It was the District Court, not opposing counsel, who played the role of MidAtlantic's advocate.  *See Crandell v. United States*, 703 F.2d 74, 77 (4th Cir. 1983) ("This action by the trial judge was particularly glaring since the defendant's counsel never objected to the form or appropriateness of the questions—the court simply assumed the role of an advocate").

---

*(. . . note continued from previous page)*
(commenting, incorrectly, that there was evidence that both furnaces were out and calling attention to testimony of another witness); JA 289:7-290:21 (reading portion of deposition favorable to MidAtlantic); JA 291:4-5 (repeating question to witness); JA 291:13-292:1 (telling counsel not to ask Smith about pleadings); JA 292:11-14 (asking whether Smith had anything to do with testing); JA 294:23-295:5 (asking about exhibit); JA 298:4 (asking about exhibit); JA 300:14-17 (asking about exhibit); JA 301:3-15 (asking about exhibit); JA 303:15 (asking to clarify question about testing for compliance with contract requirements); JA 303:24-304:13 (asking Smith whether MidAtlantic tested for acid insolubles); JA 305:7 (asking about exhibit); JA 306:1-2 (saying witness need not testify about date complaint was filed); JA 306:9-379:2 (asking counsel to clarify which specifications the question concerned); JA 307:9-311:7 (asking whether MidAtlantic tested dolomite in warehouse).

Nor did the District Court mete out its interruptions evenhandedly. *See Sit-Set, A.G. v. Universal Jet Exchange, Inc.*, 747 F.2d 921, 926 (4th Cir. 1984) (reversing verdict, observing that "[t]his is not a trial in which possibly prejudicial interventions by the court were sufficiently balanced between the parties that overall no impression of partiality for one side's position over the other's was likely to have been conveyed."). *Cf. Head*, 697 F.2d at 1210 (affirming verdict where the excessive interruptions were distributed between the parties with "remarkable, though purely random, evenhandedness"). The District Court injected itself into MidAtlantic's counsel's direct examination of Smith only 10 times.[29] Four of those interruptions concerned exhibits. And of the remaining six, three were questions to Smith that were either neutral or MidAtlantic-friendly, and two were comments on the

---

[29] JA 232:5 (asking Smith about Jose Boves's role at company and apologizing for the interruption); JA 235:20 (asking about exhibit); JA 239:14 (commenting about whether exhibit was in evidence); JA 241:11 (cutting Smith off when Smith began discussing AGC's interpretation of contract); JA 243:20 (saying that email "says what it says"); JA 244:14 (asking Smith whether remaining dolomite was part of 2010 shipment); JA 263:14 (asking about exhibit); JA 265:22-266:11 (commenting about redundancy in exhibits); JA 267:4 (asking Smith about a mobile crusher); JA 269:18 (stating that relevant prime rate is what it was at time of breach).

evidence.  Only one interruption—concerning a question about the contents of an email—was arguably critical of MidAtlantic or its counsel.

Other witnesses paint an even starker picture.  The District Court interrupted AGC's cross examination of another key MidAtlantic witness, Jose Boves, 17 times over the course of only 23 transcript pages—many of those interruptions criticizing AGC's counsel's style of examining witnesses.  (JA 162-85.)  By contrast, it interrupted MidAtlantic's direct examination of Boves only three or four times—one of those interjections being a series of questions to elicit and underscore testimony highly adverse to AGC.  (JA 144-62.)  See *infra* at 52.

AGC has prepared, as an attachment,[30] a table summarizing the District Court's interruptions of counsel during the examination of some of the key witnesses in the case: Dana Smith (MidAtlantic's Director), Jose Boves (a former MidAtlantic Employee), David Burkett (a production manager at AGC), Naohisa Itoh (AGC's technical development director), Andrew Kolbert (AGC's expert), and Lorrie

---

[30] Pursuant to Local Rule 28(b), AGC has—contemporaneously with the filing of this brief—moved for leave to file this as an attachment.

Cooper (AGC's purchasing director).  It shows that the District Court's

interruptions of AGC's counsel were incessant and far outnumbered its

interruptions of MidAtlantic's counsel.[31]

Even a cursory review of the transcript shows that these

interruptions did not clarify testimony or speed up trial.  *Cf. United*

*States v. Castner*, 50 F.3d 1267, 1273 (4th Cir. 1995).  To the contrary,

the District Court's constant interjections made it nearly impossible to

follow the thread of AGC's counsel's witness examinations.  This Court's

observations in *Sit-Set, A.G. v. Universal Jet Exchange, Inc.*, could just

as well have been written for the present case:

> [There was] a course of judicial domination of the
> examination of witnesses so persistent
> throughout the trial that the result was an
> effective preemption of counsel's legitimate
> function in the adversarial process.  And this
> occurred without any arguably justifying increase
> in the clarity of the evidence being elicited by
> counsel or the expedition with which it was being
> elicited.  In fact, from a review of the trial
> transcript the opposite result seems the more
> likely.

---

[31] This actually understates the case.  Many of the interruptions
involved questions to the witnesses.  As detailed in the next section,
those questions systematically favored MidAtlantic.

747 F.2d 921, 926 (4th Cir. 1984).  Simply put, AGC had to tack hard against a strong judicial headwind, while MidAtlantic had smooth sailing.  In addition to frustrating AGC's attempt to present a coherent case to the jury, the District Court's actions unfairly signaled to the jury that the court favored MidAtlantic and, *a fortiori*, its position in the litigation.

2.    The District Court improperly asked leading questions to elicit evidence favorable to MidAtlantic and to discredit MidAtlantic's witnesses.

In addition to the quantity of the interruptions, the quality of those interruptions—particularly the District Court's questions to witnesses—were systematically biased against AGC.

Federal Rule of Evidence 614(b) authorizes district courts to question witnesses.  But this power should be exercised carefully so as not to interfere unduly with the proceedings or to communicate the district court's opinion of the case to the jury.  *See* 1 McCormick on Evid. § 8 (7th Ed.) ("[T]he judge's questioning in jury cases must be cautiously guarded to avoid implied comment."); Christopher B. Mueller and Laird C. Kirkpatrick, 3 Fed. Evid. § 6:105 ("The judge's questions

50

are likely, despite even her best efforts to avoid this effect, to impart a point of view and an appraisal of evidence already presented . . . .").

A trial court increases the danger of improper influence still further when it examines witnesses using leading questions. *Pollard v. Fennell*, 400 F.2d 421, 424 (4th Cir. 1968) ("More objectionable was the fact that the district judge's questions were usually leading in form."). Hostile cross-examination may signal the trial court's disbelief of the witness and unduly affect the jury's assessment of the witness's credibility. *United States v. Ecklin*, 528 Fed. Appx. 357, 364 (4th Cir. 2013) (noting that the district court's hostile questions could "be construed to reflect the court's skepticism or disbelief of Ecklin and Carter—sentiments that should not have been expressed to the jury"). As this Court has noted, "cross-examination of a witness by the trial judge is potentially more impeaching than such examination conducted by an adversary attorney." *Godwin*, 272 F.3d at 678. *See also* 1 McCormick on Evid. § 8 ("Leading judicial questions clearly aimed at discrediting or impeaching the witness, though allowable for counsel, can intimate the judge's belief that the witness has lied, and hence constitute a verboten implied comment."). This is so because "[t]he

judge, by his office, carries an imprimatur of impartiality and credibility in the eyes of the jury." *Godwin, 272 F.3d at 678*. Indeed, "a judge's apparent disbelief of a witness is potentially fatal to the witness's credibility." *Id.*

In the present case, the District Court's questions to witnesses systematically favored MidAtlantic. Many of them were leading, suggesting the answers that the District Court sought. For instance, during MidAtlantic's direct examination of Jose Boves, a former MidAtlantic principal, the District Court elicited testimony that MidAtlantic's purpose for including a take-or-pay clause was to avoid repeating an earlier instance in which AGC had shut down a facility in Quebec, leaving MidAtlantic with leftover dolomite:

> THE COURT: So your prior experience was that you had been left with some dolomite. Is that correct?
>
> THE WITNESS: Yes.
>
> THE COURT: All right. That's enough. Let's move along. They didn't want to get caught a second time. Is that correct?
>
> THE WITNESS: Yes, exactly.

(JA 160:21-161:3.) The District Court elicited similar testimony during Plaintiff's redirect examination of Boves:

52

> THE COURT:    When you were discussing the take-or-pay clause, did the matter of Canada ever come up, about what may or may not have occurred in the past, with the people there?
>
> THE WITNESS:      Yes, the—yes, Lorrie Cooper knew exactly why we were doing the pay-or-take [sic] clause, because we never demanded that before. . . .

(JA 193.)  Not only was this testimony irrelevant—because the take-or-pay clause's language was unambiguous and so the reason for including it in the parties' agreement was irrelevant—the District Court's questions underscored MidAtlantic's theory of the case, i.e., that AGC once again had unfairly left MidAtlantic holding the bag.

Likewise, during AGC's cross-examination of Dana Smith, MidAtlantic's director, the District Court *sua sponte* and personally read portions of Smith's deposition testimony—ostensibly to supplement and clarify the testimony AGC's counsel had previously used to impeach the witness.  (JA 289:7-290:21.)  At trial, Smith claimed that he was familiar with the contract specifications.  But during his deposition, Smith had disclaimed any such knowledge.  After AGC's counsel read back the relevant deposition excerpt, the District Court itself read into evidence the next portion of the deposition.  The passage did not concern *AGC's* written dolomite specifications.  Rather,

it concerned the testing that *MidAtlantic* requested from an

independent lab, SDS, on material that it obtained from the mine.[32]  It

---

[32] The full exchange was as follows:

THE COURT:    Did you read the whole thing on Boves?  What did he say about the specifications?

MR.. SIMS:        I don't know what you're talking about.

THE COURT:    Hand it to me.

MR. SIMS:Okay.  I was on page 69 and 70.

(There was a pause in the proceedings.)

THE COURT:    He says he doesn't know, doesn't know about the moisture.

"I'm now talking about the specifications," is the question.  "Well, tell me, they're interchangeable.  Let me ask you this: other than what your counsel is trying to draw a distinction between the word requirements and specifications, did you draw that same distinction that there's a difference between the word requirements and specifications?

"Yeah. Maybe I can elaborate.

"Tell me what it is.

"Because when this was set up Mr. Boves gave written instructions to the quarry before every shipload, and SGS was given the same instructions.  These instructions were based upon what MR. Boves and AGC had worked out to be an acceptable product, but Mr. Boves took it a step further.  He made our requirement with the quarry more stringent, so anytime a ship was being produced that when Mr. Boves had retired they would send—they being SGS—would send across the results, and I would look at them and say, are they better than what we asked for?  As long as they were better, we just continued and went along our merry way.  That's why—I'm not trying to be evasive.  That's how our request to Prodomasaa, the quarry, and how that compares to

*(note continued on following page . . .)*

was not related to counsel's question about whether Smith knew or did not know AGC's actual specifications.  It was not relevant to the issues in the case, as the District Court had previously held that the parties' course of dealing could not alter the unambiguous dolomite specification in the purchase orders.  (JA 98.)  And by personally voicing Smith's words, the District Court implicitly gave its imprimatur to Smith's testimony.

The District Court also elicited and emphasized adverse evidence during AGC's case-in-chief.  One of AGC's key witnesses was Lorrie Cooper, AGC's purchasing director.  During cross-examination, the District Court interposed a question calculated to show that AGC's interpretation of the take-or-pay clause was absurd and unfair:

---

*(. . . note continued from previous page)*
what is partially on this document, partially on the dialogue between Boves and whoever, I don't know."

Okay?  Here.  That's what he was talking about in relation to the specifications.

MR. SIMS: I object, Your Honor.  That is not what he was talking about.  I object to the characterization of what the testimony was.

THE COURT: Well, I understand you don't agree with me, but that's perfectly all right, Mr. Sims.  A lot of people don't.

(JA 289:7-290:21.)

55

> THE COURT:    So you could order a bulk
> shipment as late as November and it would be on
> hand, correct?  And you wouldn't have to pay for
> it if you stopped at the end of 2011.  Isn't that
> correct?

(JA 466:18-21.)  In response, Cooper explained that AGC did not order

bulk shipments—it ordered only railcars—and that "it was up to Mr.

Smith to decide when he wanted to order a bulk ship.  I never ordered a

ship."  (JA 466:22-25.)  But the damage was done.

The District Court then tried another approach, querying whether

AGC was purchasing the estimated quantity specified in the blanket

purchase order for 2011 (i.e., 13,000 tons):

> THE COURT:  So 2011—as much as October or
> the required date, 11-30-11, you had indicated
> something—an estimated 13,000 tons, correct?
>
> THE WITNESS: Yes, sir, for the whole year.
>
> THE COURT: And yet you were only using one or
> two cars a month, correct, at this time?
>
> THE WITNESS:  No, I believe we were using six
> cars or seven cars a month at that time.

(JA 467:17-24).  This echoed questions the Court had asked during

Cooper's direct examination:

> THE COURT:  How much was it in September?
>
> THE WITNESS:  600 tons.  It's on page 5.

56

> THE COURT:  So it was going down every month?
>
> THE WITNESS:  Yes, sir.
>
> THE COURT:  You were buying less and less.
>
> THE WITNESS:   Oh, no, no, no.  It was shipping every month.  I'm sorry.  It was not going down.

(JA 459:11-17.)  The tenor of these leading questions was unmistakably adverse to AGC.[33]

As was the tenor of the District Court's questions to David Burkett, a production manager at AGC.  During MidAtlantic's case-in-chief, a former AGC employee—Gregory Bernard—had testified (by deposition) that spot checks of the dolomite did *not* reveal acid-insoluble particles greater than 30 mesh.  (JA 125-30.)  AGC, in its case-in-chief, offered Burkett's testimony to rebut this.  It argued that the rough-and-ready spot checks that Bernard performed had limited utility because the product had to be used regardless—the factory relied on a continuous process that needed to be fed the raw materials.  The

---

[33] The District Court asked leading and hostile questions to Cooper throughout her testimony, which appears at pages 844-993 of the trial transcript.

District Court asked Burkett a leading question calculated to show that this explanation was bogus:

> THE COURT: So what you're saying is you don't inspect it when you get it; it doesn't make any difference. Is that correct? Is that what you're trying to tell me?

(JA 355:17-19.) The District Court's use of the phrase "trying to tell me" unmistakably signalled its negative view of Burkett's testimony.

This hostile tone extended into Burkett's cross-examination. MidAtlantic had introduced into evidence a glass-defect report, prepared at the Kingsport plant, which purported to show no defects arising from spinel. (JA 667.) Burkett explained that this was misleading because the Kingport plant lacked equipment to test for spinel—such tests had to be performed by an outside lab. (JA 371-72, 373.) So the spinel result on the chart was meaningless. The District Court used this to get Burkett to concede that AGC's report was inaccurate:

> THE COURT: This report, then, that you were given, because of these things here, is not accurate. Is that your position, sir?
>
> THE WITNESS: Because of these things here?
>
> THE COURT: I didn't ask you because. Is it your position that this report is not accurate?

> Your report of this material is not accurate?  Is
> that correct?
>
> THE WITNESS:  This spinel graph is not correct.

(JA 373:11-18.)  These hostile and leading questions, coming as they did

from the District Court, inevitably affected the jury's assessment of

Burkett's credibility.[34]

The record contains several additional instances of the District

Court questioning witnesses in a manner adverse to AGC.  This occurs

with particular frequency during the testimony of David Burkett (Tr.

426-519, Naohisa Itoh (Tr. 664-746), and Lorrie Cooper (Tr. 844-993).

By questioning witnesses with hostile and frequently leading questions,

the District Court inappropriately "assumed the role of an advocate."

*Crandell*, 703 F.2d at 77.

### 3.    The District Court was openly hostile to AGC's counsel.

Finally, the District Court was openly hostile to AGC's counsel in

the jury's presence.  "[I]t is incumbent on the judge to conduct himself

impartially and without the obvious indication of continual agitation

---

[34] Again, these are but two examples.  The District Court's hostile
questioning occurred throughout Burkett's testimony, which appears in
the trial transcript at pages 426-519.

and hostility toward counsel for either side." *Cassiagnol*, 420 F.2d at 879. The District Court did not conduct itself impartially in this case.

On the first day of trial, in the jury's presence, the District Court summarily found AGC's counsel in contempt, presuming—incorrectly—that counsel was trying to reargue a previously decided point. (JA 113-15.) Leading up to this, AGC's counsel had objected to MidAtlantic's use of the deposition testimony of Gregory Bernard, a former AGC employee. MidAtlantic wished to use Bernard's testimony to establish that its dolomite met the 30-mesh contract specifications. AGC objected on the grounds that MidAtlantic had not previously indicated that they intended to establish that the dolomite met the 30-mesh requirement—up until trial, its theory of the case was that there was no such requirement. (JA 109-10.) The matter was discussed outside the jury's presence and the District Court overruled AGC's objections, allowing MidAtlantic to present Bernard's testimony. (JA 109-13.) After the jury re-entered the courtroom, counsel for AGC started to request that the portions of Bernard's testimony that AGC had counter-designated also be read into evidence. (JA 113:23.) The District Court cut counsel off before he could even state his purpose:

MR. SIMS:  Your Honor, I would only—

THE COURT:  I've told you before—excuse me ladies and gentlemen.

MR. SIMS:  I'm only asking—

THE COURT:  That's it.  You have nothing to say.

MR. SIMS:  It's that they—

THE COURT:  You have nothing to say.

MR. SIMS:   Okay. I need to make a—

THE COURT:  You cannot.

MR. SIMS:   I need to make it on the record, Your Honor.  I need to make an objection.

THE COURT:  You can come up here and do it.  Mr. Sims, you're in contempt.

Come on up, Mr. Chapman.

Don't you ever do that again.

(JA 113:23-114:12.)  During the ensuing discussion outside the hearing of the jury, AGC's counsel was finally able to explain that he was just asking to have additional portions of the transcript read.  (JA 114:17-20.)  Later in the colloquy, the District Court acknowledged that AGC's counsel had merely wanted to read the counter-designated portion of the transcript, saying "I know that, but you could have done that without saying anything."  (JA 115:4-5.)

Yet the District Court did not retract the contempt ruling.  To the contrary, it compounded the problem by suggesting to the jury that counsel *had* violated the Court's rule against rearguing already decided points:

> THE COURT: Excuse me.  Just because I may admonish an attorney, ladies and gentlemen, that doesn't mean I'm taking any side in this case.  I just want to—I had explained to them before and I'll explain again.  Once I've made a ruling, that's it.  It's over.  I want to give them the opportunity to put it on the record.  They can take the next break and put all they want on the record.  But we're going to move this case along.

(JA 115:8-15.)  Thus, the District Court left the jury with the false and prejudicial impression that counsel for AGC had warranted the contempt ruling by violating the District Court's rules.

On the third day of trial, the District Court told counsel for AGC— again, in the jury's presence—that it seldom agreed with him.  (JA 368.) Counsel for AGC had just objected to opposing counsel's describing the contents of a document whose admissibility AGC contested.  The District Court sustained the objection, but in a backhanded manner, stating "I agree with you 100 percent, Mr. Sims.  It's very rare that I agree, but I agree."  (JA 368:4-5.)  Judge Doumar's assertion, in the

jury's presence, that he seldom agreed with AGC's counsel inevitably colored how the jury viewed AGC's counsel and, by extension, AGC's case.

The District Court's peremptory, dismissive, and critical interruptions of AGC's counsel—on these and many other occasions— were not the "cool and well-balanced utterance[s] of an impartial judge." *Cherry*, 720 F.3d at 167.  Their cumulative effect was to deny AGC a fair trial.

> 4.    The District Court's boilerplate instruction that the jury was the sole judge of facts did not cure the prejudice created by the District Court's conduct.

AGC anticipates that MidAtlantic will argue that any unfairness caused by the District Court's evident bias was cured by the District Court's instructions to the jury that "the determination of facts is your function" and that the jury should not "assume that I hold any opinion on the matters to which my questions may have related."  (JA 618, 620.) Under the circumstances of this case, however, such a "boilerplate final instruction . . . could not be thought to have removed the impression here necessarily conveyed of judicial partiality for, indeed acceptance of,

the defendant's position." *Sit-Set, A.G.*, 747 F.2d at 926. The District Court's constant interruptions, leading questions, and hostility to counsel systematically destroyed AGC's ability to present its case fairly to the jury. A few magic words at the end of trial could not, and did not, erase that overwhelming prejudice.

*    *    *

Appellate courts understandably are reluctant to reverse jury verdicts due to judicial interference; counsel does not make the present arguments lightly. But the law entitles every litigant to a fair trial. And in the present case no impartial spectator in the courtroom—or reader of the trial transcript—could come away believing that the District Court allowed AGC fairly to present its case to the jury.

CONCLUSION AND REQUEST FOR ORAL ARGUMENT

For all of the foregoing reasons, AGC respectfully requests that this Court reverse with instructions to enter final judgment for AGC on MidAtlantic's take-or-pay clause contract claim or, in the alternative, to order a new trial. AGC respectfully requests that this Court allow it to present its arguments orally to a panel of this Court.

64

AGC FLAT GLASS NORTH AMERICA, INC.


By: _____ /s/ Joseph M. Rainsbury _____
                    *Counsel*


Joseph M. Rainsbury (VSB No. 45782)
LeclairRyan, A Professional Corporation
1800 Wells Fargo Tower
Drawer 1200
Roanoke, Virginia 24008
Telephone: 540.510.3055
Facsimile: 540.510.3050
joseph.rainsbury@leclairryan.com


Charles M. Sims (VSB No. 35845)
LeclairRyan, A Professional Corporation
Riverfront Plaza, East Tower 8th Floor
951 East Byrd Street
Mailing: P.O. Box 2499
Richmond, Virginia  23219
Telephone: 804.343.5091
Facsimile: 804.783.7655
charles.sims@leclairryan.com

*Counsel for AGC Flat Glass North America, Inc.*

65

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,534 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (Century Schoolbook) using Microsoft Word 2010 in 14-point font.

/s/ Joseph M. Rainsbury

<u>CERTIFICATE OF SERVICE</u>

I certify that on July 11, 2014, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system.


          /s/ Joseph M. Rainsbury